# AFFIDAVIT

I, Allison Hirsch, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent of the Federal Bureau of Investigation, and have been since 2009. I am currently assigned to the Denver FBI Child Exploitation Task Force. As part of my duties, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of Title 18, United States Code, Sections 2251, 2252, and 2252A. As part of my experience, I have reviewed images containing child pornography in a variety of formats (such as digital still images and video images) and media (such as digital storage devices, the Internet, and printed images).

2. This affidavit is submitted in support of an application for a search warrant for the place described in Attachment A (hereinafter "Subject Premises,"), and the computer(s) located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2252A(a)(5)(b) (Knowingly Accessing with intent to view Child Pornography).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2252A are presently located at the Subject Premises.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## RELEVANT STATUTES

5. This investigation concerns alleged violations of 18 U.S.C. Sections 2252A, relating to material involving the sexual exploitation of minors.

6. 18 U.S.C. Section 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any material that contains child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

7. The following definitions apply to this Affidavit and Attachment B to this Affidavit.

8. "Child Pornography" includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

9. "Visual depictions" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image See 18 U.S.C. § 2256(5).

10. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

11. "IP Address" means Internet Protocol address, which is a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

12. "Internet" means a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

13. In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## SEIZURE AND SEARCH OF COMPUTERS

14. As described above and in Attachment B, I submit that if computers or storage media are found at the Subject Premises, there is probable cause to search and seize those items for the reasons stated below. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

15. For example, based on my experience, as well as information imparted to me by other law enforcement officers, I know that a powered-on computer maintains volatile data. Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

16. Based on my experience, as well as information imparted to me by other law enforcement officers, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an

active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

17. Also, again based on my experience, as well as information imparted to me by other law enforcement officers, I know that wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files. Computer users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

18. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

19. The monitor and printer are also essential to show the nature and quality of the images or files that the system can produce. In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

20. The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate the computer to commit offenses involving the sexual exploitation of minors. Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to otherwise commit the crimes described herein. The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

21. Information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

22. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information,

configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. For example, your Affiant knows from experience, as well as information imparted to me by other law enforcement officers, that persons trading in, receiving, transporting, distributing or possessing images involving the sexual exploitation of children or those interested in the firsthand sexual exploitation of children often communicate with others through correspondence or other documents which could tend to identify the origin and possessor of the images as well as provide evidence of a person's interest in child pornography or child sexual exploitation. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

23. Your Affiant knows from experience, as well as information imparted to me by other law enforcement officers, that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

24. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

25. Furthermore, because there is probable cause to believe that the computer and its storage devices are all instrumentalities of crimes involving child exploitation, they should all be seized as such.

26. Based upon my experience, as well as information imparted to me by other law enforcement officers, I know that a thorough search for information stored in digital storage media requires a variety of techniques that often include both on-site seizure and search as well as a more thorough review off-site review in a controlled environment. This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment. These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

27. For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

   A. On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

- B. On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted);

- C. On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

28. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment. This is true because of the following:

- A. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis. Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

- B. The volume of evidence and time required for an examination. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

- C. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

- D. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

- E. Need to review evidence over time and to maintain entirety of evidence. Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable

5

to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

29. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching as well as off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

30. Because several people may share the Subject Premises as a residence, it is possible that the Subject Premises will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

31. Your Affiant knows from training and experience that digital storage devices can be very large in capacity, yet very small in physical size.  Additionally, your Affiant knows from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime.  The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents.  Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

32. Based on my training and experience, I know that Apple devices typically are equipped with "Touch ID." A Touch ID sensor, a round button on the iPhone or iPad, can recognize fingerprints. The fingerprints authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require. The Touch ID feature only permits up to five attempts with a fingerprint before the device will require the user to enter a passcode. Furthermore, if the device is equipped with an operating system that is earlier than version 9.3, the Touch ID feature will not substitute for the use of a passcode or password if more than 48 hours have passed since the device has been unlocked; in other words, if more than 48 hours have passed since the device was accessed, the device will require the passcode or password programmed by the user and will not allow access to the device based on a fingerprint alone. If the operating system is version 9.3 or later, that time frame shrinks to 8 hours. Similarly, Touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful. For these reasons, it is necessary to use the fingerprints and thumbprints of any device's users to attempt to gain access to any Apple devices found at the Subject Premises while executing the search warrant. The government may not be able to obtain the contents of the Apple devices if those fingerprints are not used to access the Apple devices by depressing them against the Touch ID button. Although I do not know which of the ten finger or fingers are authorized to access on any given Apple device and only five attempts are permitted, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for Touch ID, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

33. Similarly, in my training and experience I know that other manufacturers' devices have the same capability as Touch ID—that is, the ability to unlock the phone with a fingerprint. In addition, some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or fingerprint. Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others. Accordingly, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Subject Premises to the Touch ID sensor or other device fingerprint sensor of the seized device, to the extent a visual inspection of those devices reveals that the device has a fingerprint sensor.

## BACKGROUND REGARDING THE INTERNET AND CHILD EXPLOITATION

34. I have received and continue to receive training regarding the crimes involving the sexual exploitation of children. I also own my own computer, have personal knowledge of the operation of a computer, and have accessed the Internet for numerous years. Based on this training and knowledge, and the experience of other law enforcement personnel involved in this investigation, I know the following:

35. Child pornographers can produce images using a wireless device such as a cell phone. Photos can also be made using cameras, then can be transferred onto another device either using wire or wireless technology. Images can also be uploaded to Internet-based storage commonly referred to as the "cloud." Hard-copy images can also be scanned into a computer. Via the Internet, connection can be made to literally millions of computers around the world. Child pornography can be transferred quickly and easily via electronic mail or virtually countless other online platforms, communication services, storage services, and applications.

36. A computer's capability to store images in digital form makes it an ideal repository for child pornography and other files related to the sexual abuse and exploitation of children. The digital-storage capacity in devices and in the "cloud" has grown tremendously within the last several years. Thumb drives with a capacity of 32 gigabytes are not uncommon. Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon. Phones with over 100 gigabytes in storage are not uncommon. Devices can store thousands of images and videos at very high resolution. These devices are often internet capable and can not only store, but can transmit images via the

internet and can use the devices to store images and documents in internet or "cloud" storage spaces. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

37. With Internet access, a computer user can transport an image file from the Internet or from another user's computer to his own computer, so that the image file is stored in his computer. The process of transporting an image file to one's own computer is called "downloading". The user can then display the image file on his computer screen, and can choose to "save" the image on his computer and/or print out a hard copy of the image by using a printer device (such as a laser or inkjet printer). Sometimes the only method to recreate the evidence trail of this behavior is with careful laboratory examination of the computer, modem, printer, and other electronic devices.

38. Your Affiant knows from experience, as well as information imparted to me by other law enforcement officers, that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

39. Your Affiant knows from experience, as well as information imparted to me by other law enforcement officers, that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

## INVESTIGATION

40. On or about October 6, 2017, Google reported to the National Center for Missing and Exploited Children (NCMEC) via cybertip 24768955 that two files containing child pornography were uploaded on 10/06/2017 by IP address 75.171.146.240; Google viewed the entire file of contents of both uploaded files. Google reported to NCMEC that the Google user who uploaded these two child pornography files was Scott Garland and provided an associated telephone number and e-mail address for the user. On or about December 21, 2018, Google reported to NCMEC via cybertip 44514621 that two files containing child pornography were uploaded to Google photos infrastructure by Google user Scott Garland, and provided an associated telephone number and e-mail address for the user. FBI Denver investigated the cybertips and identified a potential subject as Scottie Garland, year of birth 1964.

41. On or about April 30, 2019, and again, on or about May 1, 2019, FBI Denver interviewed Scottie Garland ("Garland"), year of birth 1964. Garland admitted during the interviews to possession and distribution of child pornography and consented to a search of his electronic devices, and further consented to allow the FBI to assume certain online identities Garland possessed, including his Telegram[1] account @incestperv; both the consent to search and consent to assume online identities were documented via FBI paperwork with Garland. An initial review of Garland's devices by FBI Denver indicated more than 75 videos/images depicting child pornography, many of which featured babies being sexually assaulted. Garland's electronic devices have not yet been fully processed or analyzed by FBI Denver. Garland stated in his interviews with FBI Denver that he preferred to masturbate to child pornography that had babies and young toddlers in it. Garland further stated he had previously viewed child pornography with Ray Brown, who used to live in

---

[1] According to information regarding Telegram available on the Internet: "Telegram is a messaging app with a focus on speed and security… You can use Telegram on all your devices at the same time — your messages sync seamlessly across any number of your phones, tablets or computers. With Telegram, you can send messages, photos, videos and files of any type (doc, zip, mp3, etc), as well as create groups for up to 200,000 people or channels for broadcasting to unlimited audiences. You can write to your phone contacts and find people by their usernames. As a result, Telegram is like SMS and email combined — and can take care of all your personal or business messaging needs. In addition to this, we support end-to-end encrypted voice calls." Based on my training and experience, Telegram is service that is facilitated by cellular tower networks and/or the Internet.

Garland's building at The Manhattan but presently lived near Yale Station. Garland described parties that Ray Brown and Garland attended where they (Garland and Ray Brown, amongst others) used "meth" and watched child pornography while engaging in sexual activity with adults.

42. Based on Garland's interviews and a review of Garland's electronic devices, FBI Denver identified Raymond E. Brown, year of birth 1960, as a likely match to the "Ray Brown" that Garland described. On or about May 2, 2019, FBI Denver received information from United States Postal Service (USPS) Denver office that a Raymond Brown had filed a change of address with USPS on January 27, 2019, indicating that he had moved from 1801 Bassett St., Apt 401, Denver, CO 80202 (The Manhattan's address) to 5121 E. Yale Ave, Apt. # 306, Denver, CO 80222.

43. On May 8, 2019, I and other investigators from FBI Denver went to 5121 E. Yale Ave, Apt. # 306, Denver, CO 80222, and knocked on the door; no one answered. FBI SA Adam Krob slid his business card under the door of unit 306, with an added note asking "Ray" to call him (SA Krob) as soon as possible. Later on May 8, 2019, Raymond Brown, year of birth 1960, contacted SA Krob and agreed to meet investigating agents in the lobby of 5121 E. Yale Ave., Denver, Colorado 80222.

44. On May 8, 2019, I and other investigators from FBI Denver interviewed Raymond Brown, year of birth 1960 ("Brown"). Brown indicated he was impressed the FBI had found his residence, because he had recently moved. Brown stated he received SA Krob's business card in his apartment. Brown also provided the following information in substance:

   A. Brown used to live at The Manhattan.
   B. Brown has watched child pornography with Garland and others while taking "meth" and engaging in sexual activity with adults on one occasion. "Paul" and "Chris" both attended this meth and child pornography gathering. Brown is not currently using meth.
   C. Brown used his laptop computer to view the child pornography that was watched at the meth and child pornography gathering. Brown logged onto "Chris'" Telegram account using his (Brown's) laptop to view the child pornography.
   D. Brown has watched child pornography involving babies and young toddlers. Child pornography with babies and young toddlers is not what Brown prefers to watch. Brown likes watching child pornography where the child is enjoying himself/herself. Brown masturbates to child pornography where the child is enjoying himself/herself.
   E. Brown believes if a child is enjoying himself/herself, there is nothing wrong with child pornography. Brown would have enjoyed sexual activity as a child himself, so he knows for a fact that some of the children featured in the child pornography are enjoying themselves. Brown advised investigating agents they should not be spending time trying to locate individuals participating or enjoying child pornography in which the child is enjoying himself/herself.
   F. After FBI Denver interviewed Garland, Garland advised Brown of the interview, and Brown then contacted "Paul" via LinkedIn and advised "Paul" to get rid of any child pornography he ("Paul") had. "Paul" was one of the individuals who attended the meth and child pornography gatherings with Garland and Brown. Investigating agents asked Brown why he would advise someone to destroy evidence of a crime; Brown advised investigating agents that's just how he (Brown) is.
   G. Brown accesses his LinkedIn account using his cellular telephone and his laptop.
   H. Brown did not bring his electronic devices with him to the interview on May 8, 2019 with investigating agents because he did not want investigating agents to take his devices. Brown left his electronic devices in his apartment.
   I. Brown offered to go get his cellular telephone and to consent to a search of the device if investigating agents could guarantee it would not be seized. Investigating agents declined to search Brown's cellular telephone under those terms. However, Brown did go back to his

  apartment, retrieved his cellular telephone, and provided investigating agents with an online identity for "Chris", one of the other individuals who attended the meth and child pornography gatherings with Brown and Garland.  Brown advised investigating agents "Chris" was an avid heroin user.

 J. Brown stated investigating agents would not find any child pornography on any of his electronic devices.

### INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN AND RECEIVE AND/OR DISTRIBUTE CHILD PORNOGRAPHY

45. Based on my training and experience related to investigations involving child pornography and the sexual abuse of children, and from information imparted to me by other law enforcement officers, I have learned that individuals who possess, access with intent to view, receive or distribute child pornography have a sexual interest in children and in images of children.  Based upon my experience in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

 a. The majority of individuals who collect child pornography are persons who have a sexual attraction to children.  They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

 b. The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification.  The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their sexual fantasies involving children.  Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that is used to communicate with others about sexual activity or interest in children.  Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant.  In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

 c. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.  They almost always maintain their collections in the privacy and security of their homes, cars, garages, sheds, and other secure storage locations, such as in a digital or electronic format in a safe, secure, and private environment, including in cloud-based storage online or on their person.   The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support.  This contact helps these individuals to rationalize and validate their sexual interest and associated behavior.  The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

 d. The majority of individuals who collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children, as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires.  Such individuals rarely destroy these materials because of the psychological support they provide.

    e. The majority of individuals who collect child pornography often collect, read, copy or maintain names, screen names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

    f. Based upon experience, and the training and experience of other law enforcement officers with whom I have had discussions, your Affiant knows that persons in engaged in the production and possession of child erotica are also often involved in the production and possession of child pornography. Likewise, your Affiant knows from that persons involved in the production and possession of child pornography are often involved in the production and possession of child erotica.

    g. Based on my experience, and conversations with others in law enforcement, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage devices and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or Internet email or online storage accounts that s/he possesses. Additionally, based on this experience and these conversations, I understand that an individual who discusses the sexual abuse and/or exploitation of children on one digital storage device is likely to conduct those communications on additional digital storage devices that s/he possesses.

## CONCLUSION

46. Based on the investigation described above, probable cause exists to believe that at the Subject Premises described in Attachment A, will be found evidence, fruits, and instrumentalities of a violation of Title 18, United States Code, Section 2252A(a)(5)(B) (described on Attachment B).

47. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

                                         _s/ Allison L. Hirsch_
                                         Allison L. Hirsch, Special Agent
                                         Federal Bureau of Investigation

SUBSCRIBED and SWORN before me this __9th__ day of May, 2019.

                                         HON. S. KATO CREWS
                                         UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Patricia Davies, Assistant United States Attorney.